UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

MARTIN YOSELOVSKY,                          :

                        Plaintiff,               :

          -against-                        :

THE ASSOCIATED PRESS,                    :

                    Defendant.              :

-------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__1/18/2013__
```

**MEMORANDUM
OPINION AND ORDER**

10 Civ. 9438 (FM)

**FRANK MAAS,** United States Magistrate Judge.

       Plaintiff Martin Yoselovsky ("Yoselovsky") brings this suit against his former employer, The Associated Press ("AP"), contending that the AP terminated him because he requested accommodations so that he could observe the weekly Jewish Sabbath and other religious holidays.  Yoselovsky seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. ("Title VII"), the New York Human Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL").  The AP now has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 20).  For the reasons that follow, the motion is granted.

I.      Factual Background[1]

        The AP is a not-for-profit news gathering cooperative based in New York

City, that employs approximately 3,500 people at more than 240 locations worldwide.

(Def.'s Stmt. of Undisputed Facts (ECF No. 22) ("Def.'s Stmt.") ¶ 1).  Yoselovsky is an

Orthodox Jew, whose faith requires that he not work on the Sabbath (from sundown on

Friday until one hour after sundown on Saturday) and on certain holidays.  (Id. ¶ 9).

        On May 12, 2008, the AP hired Yoselovsky as a Manager in the Customer

Integration section of Customer Solutions, a division of the AP's Technology Solutions

department, at a salary of $115,000 per year.  (Id. ¶ 2).  Yoselovsky worked out of the

New York office.  (Id.).  A substantial part of Yoselovsky's duties at the AP required him

to oversee the efforts of three, and later, four Customer Integration Specialists who

worked on the Customer Integration Team ("CIT").  (Id. ¶ 3).  The CIT was tasked with a

significant project that involved transitioning the AP's receipt and provision of media

content from print news and satellite technologies to mobile news and internet-based

technologies.  (Id. ¶ 4).

        From May to November 2008, Yoselovsky reported directly to Michael

Pachter ("Pachter"), who was then the Manager of Customer Solutions.  (Id. ¶ 5).  Close

to the time he began working at the AP, Yoselovsky met with Merrie Singer ("Singer"),

---

[1]      The relevant background facts are derived from the parties' respective Local Civil
Rule 56.1 submissions.  Where only one party's Rule 56.1 Statement is cited, the other party's
counterstatement either does not dispute the fact alleged or fails to cite admissible evidence
supporting the contrary position.  Unless otherwise noted, the facts are either undisputed or set
forth in the light most favorable to Yoselovsky.

the AP's Director of Human Resources for Technology and Business Operations.  (Id.
¶ 27).  At that meeting, Yoselovsky raised his need for accommodations because of his
religious beliefs.  (Id. ¶ 96; Pl.'s Opp. Stmt. to Def.'s Stmt. of Undisputed Facts (ECF No.
32) ("Pl.'s Opp. Stmt.") ¶ 1).  Singer, who is Jewish, explained the AP's various benefit
programs, including paid time off for vacation and personal matters.  (Def.'s Stmt. ¶ 27).
Singer recalls discussing with Yoselovsky the AP's general policy of granting employees
eleven holidays each year (eight stated holidays, plus the employee's birthday and two
personal holidays).  (Id. ¶ 28).  She further recalls telling Yoselovsky that the AP would
accommodate requests for schedule changes for religious days of observance, and that he
could substitute any religious holiday for any of the stated holidays.  (Id. ¶¶ 27-28).
Yoselovsky, however, denies that he and Singer discussed taking time off for religious
observances, or that she ever informed him of the AP's policies regarding the substitution
of religious holidays.  (Pl.'s Opp. Stmt. ¶¶ 27-28).  Regardless, it is undisputed that
Singer told Yoselovsky that he should speak directly to his manager about any need to
take time off for religious reasons.  (Def.'s Stmt. ¶ 29).

In June 2008, Yoselovsky took off two days for the Jewish holiday of
Shavuot.  (Id. ¶ 97; Pl.'s Opp. Stmt. ¶ 1).  Later that year, in September, Yoselovsky met
with Pachter and asked that he be allowed to work from home each Friday during Eastern
Standard Time.  (Def.'s Stmt. ¶ 30).  Yoselovsky also requested time off for religious
holidays, including several holidays in October 2008.  (Id. ¶ 31).  Pachter approved both

requests and allowed Yoselovsky to work from home every Friday.  (Id. ¶ 32; Pl.'s Stmt. of Disputed Facts (ECF No. 31) ("Pl.'s Stmt.") ¶ 1).

Yoselovsky maintains that his work environment at the AP became "stressful and tense," after he took time off for the October religious holidays.  (Id. ¶ 14). In an email dated October 30, 2008, Pachter informed Yoselovsky that his monthly report was not properly organized "with the priorities at the top."  (Def.'s Stmt. ¶¶ 43-44; Ex. K).[2]  Pachter advised Yoselovsky to change the font and "make the important things stand out more by reordering the sections."  (Def.'s Stmt. ¶ 45).  He also offered to help Yoselovsky, stating that, "you can take a look at [the edits] or we can do it quickly together."  (Id. ¶ 46).

In November 2008, after Pachter left his position in the Customer Solutions Department, Yoselovsky began reporting for a short period of time to Ankur Ahluwalia ("Ahluwalia"), Deputy Director of the AP's Technology Solutions Department.  (ECF No. 25 (Aff. of Martin Yoselovsky, sworn to on Oct. 19, 2012 ("Yoselovsky Aff.")), ¶ 27).  Around that time, Ahluwalia and Yoselovsky had a conversation about Yoselovsky's schedule.  (Def.'s Stmt. ¶ 34).  Ahluwalia was surprised to learn that Yoselovsky had been allowed to work from home every Friday, but offered a revised accommodation whereby Yoselovsky would be permitted to work from home every other

---

[2]     In addition to their Local Rule 56.1 submissions, both Yoselovsky and the AP annexed a number of affidavits and exhibits to their motion papers.  The AP's exhibits are designated by letters and are referred to, for example, as "Ex. A."  Yoselovsky's exhibits are designated by numbers and are referred to, for example, as "Ex. 1."

Friday during Eastern Standard Time, and could both report to work and depart earlier on the alternate Fridays, to ensure that he would be home before sunset.  (Id. ¶ 35; Aff. of Ankur Ahluwalia, sworn to on Sept. 6, 2012 ("Ahluwalia Aff."), ¶ 3).[3]  Yoselovsky agreed that Ahuluwalia's offer constituted a reasonable compromise and thanked him for the accommodation.  (Def.'s Stmt. ¶ 36).

On November 12, 2008, Ahluwalia met with Yoselovsky to discuss his performance and the need for him to increase both the quality and the quantity of his work.  (Id. ¶ 48).  Specifically, Ahluwalia informed Yoselovsky that he needed to devote additional time to his work, maintain a professional and constructive tone in his supervisory communications with CIT members, improve the quality and timeliness of his reports to higher management, and meet deadlines.  (Id. ¶ 49).  Ahluwalia summarized the substance of the meeting in an email to Yoselovsky dated November 26, 2008.  (Id. ¶ 50; Ex. H).  In that email, among other things, Ahluwalia stated that he had advised Yoselovsky that it was "unacceptable" for Yoselovsky to "vent frustration in front of [CIT] members" and that, given his "managerial role" and the "24x7 nature of the news business," he needed to be "present at work a minimum of 37.5 hours a week."  (Ex. H at 2).

Yoselovsky has a different recollection of certain of the events in November.  According to Yoselovsky, during the November 12 meeting, Ahluwalia told

---

[3]      Unless otherwise noted, all of the AP's affidavits in support of its motion are docketed as ECF No. 20-1.

him that his "absence from work during the Sukkot holidays (in October) was not authorized." (Yoselovsky Aff. ¶ 21) (explanatory parenthetical supplied). Ahluwalia purportedly also remarked, "you know Martin, this is a professional organization – you need to work on Saturday if we need you to." (Yoselovsky Aff. ¶ 22; Pl.'s Opp. Stmt. ¶¶ 48-50). Yoselovsky responded that "it was unfair for [Ahluwalia] to accuse [him] of taking allegedly unauthorized days off during the Sukkot holidays because they were authorized by Pachter in a previously agreed upon holiday work schedule." (Yoselovsky Aff. ¶ 23). Two or three days afterward, Yoselovsky further told Ahluwalia that "it was unfair for him to criticize [Yoselovsky's] observance of the Sabbath." (Id. ¶ 24). In his complaint, Yoselovsky also accuses Ahluwalia of speaking to Human Resources sometime prior to the November 12 meeting "in an attempt to circumvent" his accommodations. (Pl.'s Stmt. ¶ 3; ECF No. 1 ("Complaint" or "Compl.") ¶ 23). How Ahulwalia attempted this, or how Yoselovsky learned of it, Yoselovsky does not say.

Beginning in late November, Yoselovsky began reporting directly to Roseann Treloar ("Treloar"), the Technical Program Manager for Legacy Satellite Replacement. (Def.'s Stmt. ¶ 6; see Ex. H). Treloar was based in the AP's San Francisco bureau, but traveled periodically to the New York office. (Def.'s Stmt. ¶ 6). Treloar did not alter the Sabbath accommodations that Yoselovsky and Ahluwalia had agreed to during the November 12 conference. (Id. ¶ 37).

It is the AP's policy to give new employees – especially those in relatively highly compensated managerial positions, such as Yoselovsky – an initial period to

become "acquainted" with the requirements of their positions.  (Id. ¶ 38).[4]  During this period, the technology managers and directors in Yoselovsky's business area worked with him and provided opportunities for him to familiarize himself with the operational and communications requirements of the job.  (Id. ¶ 39).  Nevertheless, over time, the AP's Technology Management concluded that Yoselovsky's performance was not meeting expectations, and that he was inattentive to deadlines and had skills that were "not a match for the requirements of his position at the AP."  (Id. ¶ 40).

Yoselovsky does not appear to dispute that his performance fell below the AP's expectations, but instead, attributes his poor performance to the fact that, "after his observance of the Jewish holidays in October 2008, the AP took two of his employees from him and required that he perform their work in addition to his."  (Pl.'s Opp. Stmt. ¶ 40).  The "two employees," however, were on fixed assignments that had expired. (Def.'s Stmt. ¶ 91).  One employee was an independent contractor; the other was an AP employee ordinarily assigned to the AP's Atlanta office, who was at the New York office only on a fixed, temporary basis.  (Id. ¶ 92).  In addition, although both men "worked directly" for Yoselovsky, (Pl.'s Opp. Stmt. ¶ 90), neither was assigned solely to him. (Def.'s Stmt. ¶ 90).  At any rate, in December 2008, the AP actually <u>increased</u> the number

---

[4]        In his Rule 56.1 Statement, Yoselovsky argues that, while it "may be the AP's policy [to allow an initial period for new employees to adjust to their job requirements], [it] is not the reason why [he] did not have any negative reviews prior to taking the October accommodations, and thus, the AP didn't have a legitimate reason to terminate [his] employment."  (Pl.'s Opp. Stmt. ¶ 38).  This assertion plainly is conclusory.

of CIT team members assigned to Yoselovsky from three to four.  (Id. ¶ 93; Pl.'s Opp.

Stmt. ¶ 1).

On December 16, 2008, Treloar sent Yoselovsky an email stating that, after

reading his monthly report several times, she "had a hard time following it."  (Ex. B;

Def.'s Stmt. ¶ 51).  She offered specific suggestions as to how he could improve, and

attached a version of the report with her questions and comments.  (Id.).  She ended the

email by stating:  "I would be happy to discuss this further with you via phone.  Just let

me know."  (Id.).  Yoselovsky did not accept Treloar's offer to discuss the report, (Def.'s

Stmt. ¶ 52), because he believed that he understood Treloar's comments and did not need

further assistance, and because he thought that the meetings he had with Treloar after the

December 16 email were sufficient to address the issue.  (Pl.'s Opp. Stmt. ¶ 52).

Throughout early 2009, Treloar and Ahluwalia discussed Yoselovsky's

performance, concluding that it was "sub-par."  (Aff. of Roseann Treloar, sworn to on

Sept. 6, 2012 ("Treloar Aff."), ¶ 12).  On January 5, 2009, Treloar sent another email to

Yoselovsky, stating that his report was "better," but that she "still had to read through a

lot of information to get to the end results."  (Ex. C; Def.'s Stmt. ¶ 53).  She directed

Yoselovsky to include a one-page "executive summary" in future reports.  (Ex. C).

On January 29, 2009, Treloar met with Yoselovsky to discuss his work

performance.  (Def.'s Stmt. ¶ 55).  During the meeting, Treloar noted that Yoselovsky

was not devoting sufficient time and attention to his work, was not reporting to work by

7:30 a.m. on alternate Fridays, was untimely and/or unresponsive with respect to his

communications and reports, and resisted the direction and suggestions of higher management.  (Def.'s Stmt. ¶ 55).  Treloar provided Yoselovsky with specific performance guidelines and standards, stating that she was there to "support" him, that he should "let [her] know" if he was "unclear on any of these issues or tasks," and that she would "continue to meet [with him] on a regular basis to review performance progress." (Id. ¶ 56-58).  At the conclusion of the meeting, Treloar warned Yoselovsky that his failure to improve his performance and to meet the standards they had discussed would subject him to termination.  (Id. ¶ 59).

Yoselovsky does not dispute these aspects of the January 29 meeting.  He merely contends that Treloar also told him during the meeting that "absence from work for religious holidays was not authorized," despite his previously-approved holiday work schedule.  (Yoselovsky Aff. ¶ 13).  Yoselovsky also contends that this was Treloar's primary reason for meeting with him.[5]  (Pl.'s Opp. Stmt. ¶ 57).

On February 3, 2009, Treloar sent an email to Yoselovsky, in which she summarized some of the "serious concerns" that she had discussed with him during the January 29 meeting.  (Ex. D; Def.'s Stmt. ¶ 60).  Treloar stated that there was a perception that Yoselovsky was "not devoting the time and effort expected of someone in a managerial position at the AP," and that "the manner in which [Yoselovsky] conducted [himself] during [the January 29] meeting and other meetings in the past . . . bordered on insubordination."  (Ex. D at 1).  Treloar went on to say that Yoselovsky's "[f]requent

---

[5]        This assertion, of course, is wholly conclusory.

interruptions, denials, excuses, and insubordinate tones [would] not be tolerated going forward." (Id.).  Among the areas of concern that her email identified were Yoselovsky's office attendance and frequent absences during critical times; his failure to respond to emails in a timely manner or at all; his contradictory replies to inquiries made by his managers; his failure to submit reports on time or to answer Treloar's requests for information; his inappropriate use of the online office calendar for "[p]ersonal entries" or "self reminders," which left "little free time for business appointments;" his improper use of "standby mode" on the instant messaging system, which gave the impression that he was available when he was not; his inaccurate reporting on time sheets; and the time he spent making excuses, rather than addressing the issues and attempting to solve them. (Id.).  The email further stated that from that point forward, Yoselovsky would be expected to respond professionally to all of his managers' inquiries regarding his work performance; meet all due dates for reports and notify his manager at least 36 hours in advance if he experienced any issues meeting a deadline; respond professionally to all emails within an appropriate time period; change all personal entries and self reminders on his calendar to appear as "Free;" set his instant messenger status to "Appear Offline" prior to putting his computer in standby mode; and accurately record time off on his time sheets and correct any previous errors. (Id.).  In addition, the email indicated that Yoselovsky would have to begin handling some additional tasks, such as maintaining and updating the "SharePoint" site, and producing a weekly CIT report. (Id.).  Treloar closed the email with these observations:

> Martin, these issues are seriously affecting your ability to be an effective Customer Integration Manager.  If you are unclear on any of these issues or tasks, please let me know.  If your performance does not improve immediately, or if other performance issues surface, you may be subject to additional disciplinary action up to and including termination.
>
> Martin, you are currently involved in a very high-profile project with great potential and I am here to support you and help you succeed.  We will meet this week to further discuss the tasks and set timelines and will continue to meet on a regular basis to review performance progress.

(Id. at 2).  The email made no mention of any discussion that Yoselovsky's time off for religious holidays had been "unauthorized."

Yoselovsky alleges that, following the January 29 meeting, Treloar attempted to "impair his ability to perform his job," by no longer allowing him to delegate work to his consultant, adding job responsibilities that had previously been handled by two employees who reported to him, giving him "numerous assignments over an unreasonably short period of time," "[c]onstantly changing" her format requirements for his weekly reports, and instructing him to cancel meetings to work on a high-priority project, yet later criticizing him for canceling those meetings.  (Pl.'s Stmt. ¶ 8).

In addition to Treloar's comments and suggestions, Yoselovsky also received written feedback from Ahluwalia following their meeting on November 12, 2008.  (Def.'s Stmt. ¶ 61; Pl.'s Opp. Stmt. ¶ 61).  In an email dated February 17, 2009, Ahluwalia provided specific suggestions as to how Yoselovsky could improve his weekly CIT reports, including making changes to the formatting and font.  (Def.'s Stmt. ¶ 63; Ex.

I).  Ahluwalia commented further that Yoselovsky needed to put more thought into his

reports before submitting them, and attached a revised version of Yoselovsky's most

recent report.  (Id.).  He stated that Yoselovsky should set up an appointment with him if

he had questions about the report changes.  (Def.'s Stmt. ¶ 64; Ex. I; Pl.'s Opp. Stmt.

¶ 64).[6]  Yoselovsky did not, however, attempt to set up a follow-up meeting with

Ahluwalia.  (Def.'s Stmt. ¶ 65).

In early April, Treloar gave Yoselovsky a "large assignment" which was

due during Passover.  (Pl.'s Stmt. ¶ 9).  When Yoselovsky told Treloar that "the Passover

holidays were approaching," she responded by stating:  "I don't want to hear it."  (Id.

¶ 11).  Yoselovsky took four days off for Passover, but was nonetheless able to complete

the assignment during "personal time" before the holiday began, by "working extremely

early in the morning and late at night."  (Compl. ¶ 34).

On April 15, 2009, Jeff Shreves ("Shreves"), another AP manager, emailed

Treloar about a "weird" telephone call with Yoselovsky the prior day.  (Def.'s Stmt. ¶ 66;

Ex. E).  He reported that Yoselovsky called him to discuss the implementation of a

certain computer program, but that he had a difficult time understanding Yoselovsky's

"objective or point," and that, in the end, it "escaped [him]" entirely.  (Ex. E).  Shreves

went on to state that it was a "strange conversation," and "[t]he more I asked about what

---

[6]      Yoselovsky contends in his Rule 56.1 submission that Ahluwalia did not offer to
meet with him because he genuinely wanted to help Yoselovsky learn, but only so that the AP
supervisors could set up a fraudulent record to justify his eventual termination.  (Pl.'s Opp. Stmt.
¶ 64).  This too, of course, amounts to legal argument, not a response to the facts alleged in the
AP's Rule 56.1 Statement.

[Yoselovsky's] goals were, the more hesitant and awkward it got.  I am not sure he even knew what he was supposed to be doing."  (Id.).

Also on April 15, Treloar emailed Yoselovsky regarding deficiencies in his report regarding one of the AP's systems.  (Def.'s Stmt. ¶ 67).  She provided specific corrections and feedback on improving the quality of his future reports.  (Id.).

There is some dispute concerning Yoselovsky's time off from work for non-religious reasons.  Treloar alleges that "[i]t was typical for Mr. Yoselovsky to be absent from work, to depart early from work, and to be unable to complete work for a variety of personal reasons that were wholly unrelated to his religious observances." (Treloar Aff. ¶ 15; Def.'s Stmt. ¶ 68) (emphasis omitted).  According to Treloar, Yoselovsky frequently missed work for family emergencies, family social engagements, doctors' appointments, personal illness, inclement weather, personal transportation problems involving his car, and public transportation problems involving trains.  (Id.; see also Ex. L (documenting ten of Yoselovsky's absences between December 1, 2008, and April 20, 2009)).

Treloar contends that a high number of Yoselovsky's personal absences correlated with days when he knew that she would be traveling from San Francisco to visit the New York office.  (Def.'s Stmt. ¶ 69).  For example, Treloar confirmed with Yoselovsky that she would be in the New York office on January 14, 2009, and wanted to meet with him.  (Id. ¶ 71; Pl.'s Opp. Stmt. ¶ 1).  On the day she arrived, however, Yoselovsky cut their meeting short, claiming to have a doctor's appointment that he

13

"could not" miss.  (Id.).  At his deposition, Yoselovsky was unable to explain why the appointment was so important that it could not be rescheduled.  (Def.'s Stmt. ¶ 72).

According to Treloar, Yoselovsky scheduled a meeting at the AP's Cranbury, New Jersey office on January 15, 2009, knowing that this was a day when Treloar would be visiting.  (Id. ¶ 73).  When the meeting was cancelled, Yoselovsky did not return to New York to meet with her.  (Id. ¶ 74).

Yoselovsky takes issue with Treloar's suggestion that it was "typical" for him to be absent from work, leave early on days other than Fridays, and be unable to complete work on a timely basis.  (Pl.'s Opp. Stmt. ¶ 68).  He further contends that he "did not miss more work for non-religious reasons than other AP employees." (Yoselovsky Aff. ¶ 38; Pl.'s Opp. Stmt. ¶ 68).  With respect to the meeting in Cranbury, Yoselovsky insists that it had been scheduled by someone else, and that when he learned it had been canceled, he chose to work on-site at the Cranbury office because it "would have taken approximately 2 hours" to travel back to the New York office, "at which point the work day would have almost concluded."  (Pl.'s Opp. Stmt. ¶¶ 73-74).  Yoselovsky further explained that he "did not assume that . . . Treloar wanted to meet with him each day she traveled to the AP's New York City office."  (Id. ¶ 69).

Treloar's complaints about Yoselovsky's performance were not limited to his absences from the office.  She alleges that on the days when Yoselovsky did report to work, he often was unavailable to CIT members and her because of his frequent use of the AP's gym.  (Treloar Aff. ¶ 19; Def.'s Stmt. ¶ 75).  According to Treloar, Yoselovsky

14

would go to the gym for yoga, personal work-outs, or kick-boxing sessions that lasted in excess of one hour during regular business hours.  (Def.'s Stmt. ¶ 76).  Indeed, in December 2008, Yoselovsky was named "Member of the Month" based on his use of the AP gym.  (Id. ¶¶ 77-78; Ex. J).  Treloar further contends that Yoselovsky would "block out" his gym time on his electronic calendar, making it difficult for her and CIT members to schedule meetings.  (Def.'s Stmt. ¶ 79).  Yoselovsky also would block out one half-hour at the beginning of the day for "review[ing] plans for the day" and another half-hour at the end of the day for "planning."  (Id. ¶ 80; Ex. G).  Treloar told Yoselovsky that it was inappropriate for him to make himself unavailable by continuing to block out time on his electronic calendar in this manner.  (Def.'s Stmt. ¶ 82; Pl.'s Opp. Stmt. ¶ 1).

Yoselovsky maintains that he worked-out at the gym for only "approximately 45-60 minutes, 2-3 times a week," although he admits that he used the gym more frequently in December because of "slow business activity during that time." (Pl.'s Opp. Stmt. ¶¶ 75-77).  Yoselovsky further claims that his practice of blocking out time on his schedule for planning and the gym did not affect the scheduling of meetings because most of his AP colleagues, including Treloar, "did not check [his] electronic calendar before calling him to schedule meetings."  (Id. ¶ 79).

In April 2009, after consulting with Michelle Erlich, the AP's Director of Global Labor and Employee Relations/Human Resources, Singer, Treloar, and Ahluwalia determined that Yoselovsky's performance had "not improved to the level necessary for continued managerial employment at the AP."  (Def.'s Stmt. ¶ 84).  On April 29, 2009,

15

Singer and Treloar met with Yoselovsky to inform him that he was being terminated. (Id. ¶ 85). During the meeting, the AP representatives told Yoselovsky that the reasons for his termination included his poor management of CIT members, poor communication and report writing skills, and poor exercise of managerial skills and independent discretion, including an inability to resolve problems independently or to produce work in a timely and professional manner. (Id. ¶ 86).

Yoselovsky stated in his unemployment insurance claim that the reason given to him for his termination was poor performance. (Id. ¶ 100). He did not indicate in his paperwork that he had been terminated for discriminatory reasons. (Id. ¶ 101).[7]

## II.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law" based on supporting materials in the record. Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable juror could return a verdict for the nonmoving party.'

---

[7]   Yoselovsky also apparently failed to allege discrimination as the basis for his termination in sessions with his psychiatrist in 2009. (See Ex. O). To the contrary, he told his psychiatrist shortly after his termination that he was fired because he was "overloaded with other people's work." (Id. at 47). He did not say anything to the psychiatrist regarding religious discrimination for a "considerable time" after his termination. (Id. at 39). While his initial silence in that regard might be relevant to his credibility under the doctrine of impeachment by omission, see 3A James H. Chadbourn, Wigmore on Evidence § 1042, at 1057 (rev. ed. 1970), assessments of the credibility of a witness are not appropriate at the summary judgment stage. Donnelly v. Greenburgh Cent. School Dist. No. 7, 691 F.3d 134, 146 (2d Cir. 2012). Therefore, any statements that Yoselovsky may have made or failed to make to his psychiatrist are not a basis upon which summary judgment may be granted.

A fact is material if it 'might affect the outcome of the suit under the governing law.'" Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party.  Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). To defeat a properly-supported motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the party opposing summary judgment must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256; see also FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (non-moving party cannot simply rely on "conclusory allegations or unsubstantiated speculation").

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court.  Fischl, 128 F.3d at 55.  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Id. at 55.

Although the Second Circuit has "sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions," Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 603 (2d Cir. 2006) (internal quotations omitted), district courts have routinely been reminded that, "[e]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (internal quotations and citations omitted).  Indeed, the Supreme Court has repeatedly rejected the notion that discrimination should be treated any "differently from other ultimate questions of fact." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 524 (1993)).  "It is now beyond the cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); see also Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation").

18

III.    Religious Discrimination under Title VII[8]

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To overcome a motion for summary judgment under Title VII, "a discrimination plaintiff must withstand the three-part burden-shifting laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)." McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006).  Under that rubric, the plaintiff must satisfy an initial burden of "proving by a preponderance of the evidence a prima facie case of discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  To establish a prima facie case, an employee must show that:  (a) he was within the protected class; (b) he was qualified for the position he held; (c) he was subjected to an adverse employment decision or discharge; and (d) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Reynolds

---

[8]     Yoselovsky's complaint charges the AP with religious discrimination in violation of Title VII, the NYSHRL, and the NYCHRL.  He does not advance a retaliation claim.  Because claims brought under the NYSHRL and NYCHRL are evaluated under the same burden-shifting standards applied to Title VII discrimination claims, each of Yoselovsky's claims may be reviewed together.  See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010); Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010); Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009).

v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). Among the actions that qualify as materially adverse are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." Id.

Once the plaintiff makes out a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quoting Stratton, 132 F.3d at 879). The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." Felder v. Securitcus Sec. Serv., No. 04 Civ. 9501 (LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting Fisher v. Vassar Coll., 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)).

Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993). The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the

defendant discriminated against the plaintiff.  Slattery v. Swiss Reinsurance Am. Corp.,
248 F.3d 87, 93-94 (2d Cir. 2001).  In other words, the burden shifts back to the plaintiff
to prove that "discrimination was the real reason for the employment action."  Graham v.
Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

   As Judge Lynch has observed, the McDonnell Douglas burden-shifting
framework can be somewhat murky, since the question of whether the plaintiff has met
his prima facie burden of demonstrating an inference of discrimination is often not easily
distinguishable from the question of whether the employer's actions served merely as a
pretext for some disguised discriminatory animus towards the plaintiff.  See Goldman v.
Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *5
(S.D.N.Y. May 29, 2007).  In the end, "the bottom line in a Title VII summary judgment
motion is, simply, whether plaintiff has presented sufficient evidence from which a
reasonable trier of fact could determine that defendants discriminated against her."  Id.;
see also Reeves, 530 U.S. at 143 ("Although intermediate evidentiary burdens shift back
and forth under [the McDonnell Douglas] framework, the ultimate burden of persuading
the trier of fact that the defendant intentionally discriminated against the plaintiff remains
at all times with the plaintiff") (internal quotation marks omitted).

IV.     Analysis

    A.     Prima Facie Case

        The AP does not dispute that Yoselovsky has established the first three elements of his prima facie case for religious discrimination.  (See Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 21) at 14).  As a practicing Orthodox Jew, Yoselovsky is a member of a protected class.  There is also sufficient evidence that he was qualified for his position in the AP's Customer Solutions Department.  Finally, Yoselovsky suffered an adverse employment action when he was terminated in April 2009.  See Shain v. Center for Jewish History, Inc., 418 F. Supp. 2d 360, 366 (S.D.N.Y. 2005).

        With respect to the fourth element, which requires that Yoselovsky establish that his termination occurred under circumstances giving rise to an inference of discrimination, Yoselovsky contends that Ahluwalia and Treloar began discriminating against him because he continued to request and take time off from work for the Sabbath and certain Jewish holidays.  In support of that claim, Yoselovsky alleges that Ahuluwalia and Treloar made discriminatory remarks concerning his religion and that Treloar intentionally assigned him large amounts of work over religious holidays and took away two of his employees in an effort to make his workload more difficult.  He further alleges that the temporal proximity between the dates he was off for religious holidays and when he alleges the discriminatory acts occurred supports an inference of discrimination. Given the "minimal" burden at this stage of the McDonnell Douglas analysis, Scaria v.

Rubin, 117 F.3d 652, 654 (2d Cir. 2007), I will assume that these allegations are

sufficient to establish a prima facie case of religious discrimination.[9]

      B.     Legitimate, Non-Discriminatory Reason for Yoselovsky's Termination

      The AP has proffered a legitimate, non-discriminatory explanation for why

Yoselovsky was fired.  As is established by ample and uncontroverted evidence,

Yoselovsky's job performance had, for many months, fallen well below his managers'

expectations.  "An employer's dissatisfaction with even a qualified employee's

performance may, of course, ultimately provide a legitimate, non-discriminatory reason

for the employer's adverse action."  Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001).

      The emails from Pachter, Ahluwalia, and Treloar all confirm that

Yoselovsky frequently produced unsatisfactory work:  his reports often were unorganized

or otherwise inadequate; he was unresponsive to emails and requests for information; and

he consistently failed to meet deadlines.  (Exs. B-D, F, H, I, & K).  Treloar met with

Yoselovsky regularly to discuss his performance and the need to improve both the

timeliness and quality of his reports, as well as his management of CIT members.

---

[9]     Yoselovsky raises virtually identical arguments with regard to pretext and it is thus simpler to deal with all of his contentions at that stage of the analysis.  See D'Agostino v. LA Fitness Intern., LLC, ___ F. Supp. 2d ___, No. 10-CV-1120 (SLT) (VMS), 2012 WL 4739084, at *6 n.4 (E.D.N.Y. Sept. 28, 2012) (where plaintiff raises arguments that could apply with "equal force" to the fourth prong of the prima facie case analysis and the pretext analysis, "it is more appropriate to assume that Plaintiff has established her prima facie case and address those arguments in [the court's] discussion of pretext . . ."); see also Pisana v. Merrill Lynch & Co., Inc., No. 93 Civ. 4541 (LMM), 1995 WL 438715, at *3 (S.D.N.Y. July 24, 1995) (finding it "expeditious to simply concede the existence of the fourth element [of the plaintiff's prima facie case]" and proceed with the McDonnell Douglas analysis).

(Treloar Aff. ¶ 5).  Both Ahluwalia and Treloar made note of Yoselovsky's

unprofessional attitude, which Treloar reported had "bordered on insubordination," at

several of their meetings.  (Ex. D, H).  In separate emails, Yoselovsky was warned to

refrain from making "[c]ontradict[ory] replies to inquires by [his] manager," and to avoid

"bickering" with or "vent[ing] frustration" on his team members.  (Exs. D, H).

> Both Treloar and Ahluwalia offered to help Yoselovsky by discussing his

report with him and suggesting ways he could improve the quality of his work.

Nevertheless, Yoselovsky failed to follow up with either of them.  (Treloar Aff. ¶ 7;

Ahluwalia Aff. ¶ 7).  At the January 29 meeting, three months prior to his termination,

Treloar stressed the importance of "devoting sufficient time and attention to the

fulfillment of his work obligations," reporting to work by 7:30 a.m. on alternate Fridays,

being responsive and timely with respect to his communications and reports, and

accepting "the direction and suggestions of higher management on the appropriate

performance of his position."  (Treloar Aff. ¶ 9).  Despite frequent warnings that the

failure to make adjustments to Yoselovsky's work quality would subject him to

termination, however, both Treloar and Ahluwalia determined that Yoselovsky's work

did not improve after the January 29 meeting.  (Treloar Aff. ¶¶ 11-12; Ahluwalia Aff.

¶ 8).

> In addition to his poor work product and problematic behavior, Yoselovsky

consistently ran afoul of Treloar's directives not to block off time on his electronic

calendar for personal activities during work time, which Treloar said made it difficult to

schedule meetings with him.  (Ex. D).  He further made improper use of his computer's standby mode so as to make it appear that he was at his desk when, in fact, he was not. (Id.).  Yoselovsky also had numerous absences unrelated to his religion.  (See Ex. L; Treloar Aff. ¶ 15; Def.'s Stmt. ¶ 68).  According to Treloar, many of these absences occurred on days when she was scheduled to be in the New York office.  As a result, she suspected that Yoselovsky was purposely avoiding her because, she believed, that he was consistently unprepared to answer her questions about the status of his assignments. (Treloar Aff. ¶ 16).[10]

>    According to the AP, Yoselovsky's managers eventually determined that his performance had not improved to an acceptable level and made the decision to terminate him.  On its face, this rationale for Yoselovsky's termination is sufficient to meet its burden at the second step of the McDonnell Douglas analysis.  See, e.g., E.E.O.C. v. Town of Huntington, No. 05 CV 4559 (DRH) (WDW), 2008 WL 361136, at *7 (E.D.N.Y. Feb. 8, 2008) ("Because poor job performance constitutes a legitimate, non-discriminatory reason, Defendants have satisfied their burden of production"); Boedan v. N.Y. City Transit Auth., No. 02 Civ. 9587 (GEL), 2005 WL 1161812, at *8 (S.D.N.Y. May 17, 2005) (concern about employee's poor work performance was an acceptable

---

[10]    In his defense, Yoselovsky notes that one of those absences was due to a previously scheduled meeting at the AP's office in Cranbury, New Jersey.  Yoselovsky asserts that he learned that the meeting had been canceled only after he arrived at the Cranbury office and that, rather than wasting two hours traveling back to the New York office, he worked from Cranbury that day.  He claims that he did not know that Treloar wanted to meet with him during her visit that day.  (See Pl.'s Mem. in Opp. to Mot. for Summ. J. ("Pl.'s Opp. Mem.") at 10-11).

legitimate, non-retaliatory reason for his termination); <u>Potenza v. City of N.Y. Dept. of Transp.</u>, No. 00 Civ. 707 (SHS), 2001 WL 1267172, at *6 (S.D.N.Y. Oct. 23, 2001) (plaintiff's inadequate work performance, evidenced in part by his poor communication with supervisors, was sufficient to qualify as a legitimate, non-discriminatory reason).

     C.    <u>Pretext</u>

       The burden thus shifts to Yoselovsky to demonstrate that the AP's proffered rationale for its decision to fire him was pretextual.  <u>See Ruiz v. County of Rockland</u>, 609 F.3d 486, 492 (2d Cir. 2010).  Yoselovsky advances a number of arguments in that regard.  (Pl.'s Opp. Mem. at 15-17).  None of these arguments is supported by the evidentiary record; consequently, they must be rejected.

     1.    <u>Alleged Discriminatory Remarks</u>

       Yoselovsky first contends that evidence of the AP's discriminatory intent is established by three comments allegedly made by his managers over the course of six months:  (a) Ahluwalia's alleged statement at the November 12 meeting that, because "[the AP] is a professional organization – you need to work on Saturday if we need you to," (b) Treloar's alleged statement during the January 29 meeting that taking of time off for religious holidays was "unauthorized," and (c) Treloar's alleged response that she "d[idn't] want to hear it," when Yoselovsky informed her that the Passover holidays were approaching after she just had directed him to complete a certain assignment on a deadline.  As discussed below, these remarks, even if made, do not support the conclusion that Yoselovsky was terminated on religious grounds.

a.    <u>Ahluwalia's Remark</u>

After the November 12 meeting, Ahluwalia sent Yoselovsky an email documenting their discussion.  (Ex. H).  In the attachment to that email, Ahluwalia acknowledged that Yoselovsky's prior manager had approved a "Friday work from home policy through the winter of 2008 to accommodate Yoselovsky's religious observances." (<u>Id.</u> at 2).  Ahluwalia nevertheless noted that Yoselovsky's managerial role, and the "24x7 nature of the news business," required that he be "present at work a minimum of 37.5 hours a week."  (<u>Id.</u> at 2).  Although Ahluwalia rescinded the prior accommodation, he permitted Yoselovsky to work from home on alternate Fridays, and required only that Yoselovsky start work early on the other Fridays, so that he could make up the time lost through religious observances.

As a result, Yoselovsky never had to work on a Saturday (or any Jewish holiday) during his time at the AP.  (Def.'s Stmt. ¶ 10; Pl.'s Opp. Stmt. ¶ 1).  <u>See Stavis v. GFK Holding, Inc.</u>, 769 F. Supp. 2d 330, 336 (S.D.N.Y. Jan. 28, 2011) (evidence that plaintiff was "never denied a religious holiday" counseled against his discrimination argument).  Thus, even if Ahluwalia made a statement at some point during the November 12 meeting that Yoselovsky would have to work on Saturdays, if necessary, he never followed through.  Instead, he worked with Yoselovsky to arrive at an accommodation that would maximize Yoselovsky's hours at work.  Tellingly, even Yoselovsky concedes that the agreement they reached was "fair."  (Def.'s Stmt. ¶ 36; Pl.'s Opp. Stmt. ¶ 1).

27

As the Second Circuit has noted, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."  Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (quoting Tomassi v. Insignia Fin. Grp., Inc., 418 F.3d 111, 116 (2d Cir. 2007)).  Similarly, "[t]he more a remark evidences a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  Id.

Here, the statement that Yoselovsky would have to work on Saturdays, if made, may simply have reflected a misunderstanding as to the requirements of Yoselovsky's faith.  In any event, by the end of the November 12 meeting, Yoselovsky and Ahulwalia had arrived at an adequate accommodation, suggesting that Ahluwalia was not expressing any disdain for Yoselovsky's religious beliefs.  The assertion that the decision to terminate Yoselovsky was made on religious grounds is further belied by the fact that two of the employees who made it are themselves Jewish.  (See Aff. of Merrie Singer, sworn to on Sept. 7, 2012 ("Singer Aff."), ¶¶ 2, 13; Aff. of Michelle Ehrlich, sworn to on Sept. 4, 2012 ("Ehrlich Aff."), ¶¶ 2, 5).  Finally, Ahluwalia's comment also was made more than five months before he and the other AP employees concluded that Yoselovsky's subpar performance necessitated his termination.  In these circumstances, Yoselovsky cannot show that Ahuluwalia's stray remark constitutes proof that he was terminated on religious grounds.  See, e.g.,  Buckman v. Calyon Sec. (USA), Inc., 817 F. Supp. 2d 322, 335-36 (S.D.N.Y. 2011) (inappropriate comment made five months prior to

28

termination was insufficient to support plaintiff's discrimination claim); Sheridan v. N.Y. Life Inv. Mgmt., LLC, No. 09 Civ. 4746 (KBF), 2012 WL 474035, at *7 (S.D.N.Y. Feb. 9, 2012) (single comment made "nearly four months prior" not actionable); Argueta v. North Shore Long Island Jewish Health Sys., Inc., No. 01 CV 4031, 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) (remark made more than five months prior to termination did not support an inference of discrimination).

           b.     Treloar's First Remark

        The remark Treloar is alleged to have made during the January 29 meeting similarly fails to evidence any religious discrimination on the part of the AP.  Although Yoselovsky contends in his affidavit that Treloar's comment about "unauthorized" absences from work related to the time he took off for "religious holidays," the record completely belies that claim.  In fact, the only basis for Yoselovsky's contention is a single unamplified sentence in his affidavit.  (See Yoselovsky Aff. ¶ 13) ("During our January 29 . . . meeting, Ms. Treloar stated that my 'absence from work for religious holidays was unauthorized.'").  Tellingly, however, at his own deposition, Yoselovsky gave no indication that Treloar's remark related in any way to "religious holidays," stating only that she commented, at the January 29 meeting, more generally about him "taking time off unauthorized."  (Ex. N at 60).  Moreover, the two follow-up emails sent by Yoselovsky the day after the meeting, make clear that Treloar's concern about unauthorized absences had to do with his failure to record properly a sick day that he had taken in December and, thus, was unrelated to any time off he previously had taken for

religious holidays.  (Treloar Supp. Aff., sworn to on Oct. 26, 2012 ("Treloar Supp. Aff.")

(ECF No. 29), Ex. A).

After the January 29 meeting, Treloar sent an email on February 3, that

made no mention of Yoselovsky's taking time off for the Sabbath or other religious

holidays.  Instead, the email confirmed that the AP had serious concerns with

Yoselovsky's "[a]ttendance in the office and absence often during critical times," his

"[i]naccurate reporting on Time Sheets," and his failure to meet deadlines.  (Ex. D).

Indeed, Yoselovsky had either left work early or been absent at least seven times in

December and January alone, for such non-religious reasons as illness, inclement

weather, car trouble, a doctor's appointment, and a family wedding.  (See Ex. L).  For

example, the day before the January 29 meeting with Treloar, Yoselovsky emailed the

office to say that he was "snowed in" and would be working from home.  Ahluwalia sent

a response, stating:  "I can't say that I am thrilled to see this note.  Its [sic] a couple inches

of snow."  (Id.).  He reminded Yoselovsky that Treloar was in town and that he should be

working with her and getting her up to speed with CIT tasks and activities.  "Besides," he

noted, "when you're working from home you need to be available on IM."  (Id.).

These recent absences – not the time off that Yoselovsky previously had

taken for religious holidays – formed the backdrop to Treloar's January 29 meeting with

him, during which she expressed her concern about his "pattern of absences at critical

times, including days on which [she] was present in the New York office," and told him

that an absence due to illness on December 17 was considered unauthorized because he

had failed to record it in the AP's timesheet.  (Treloar Supp. Aff. ¶¶ 3-5).  Yoselovsky's

two follow-up emails are consistent with Treloar's account.  They evidence Yoselovsky's

attempt to explain "the sick day I didn't record in the timesheet system," which, as is

apparent from the context of the messages, was something they had discussed at the

January 29 meeting.

Even were that context to be disregarded, however, it is unclear exactly

which "religious holidays" Treloar could have been complaining about, since there is no

allegation that Yoselovsky had taken any time off for religious holidays (other than the

Sabbath) since October 2008 – nearly four months prior to the January 29 meeting.  It

would be odd for Treloar to express concern about Yoselovsky's four absences in

October when she did not even become his manager until November.  Moreover, Treloar

was aware of the religious accommodation that Yoselovsky had worked out with

Ahluwalia since her first days as Yoselovsky's manager, (see Ex. H at 2), so it would be

strange for her suddenly to tell him in January that any time he had taken off for religious

reasons in the past was "unauthorized."  Indeed, she made no attempt to modify his

Sabbath agreement with Ahluwalia in any way.  Thus, even assuming Treloar did tell

Yoselovsky that taking time off for religious holidays was unauthorized, there is no basis

for finding her comment discriminatory, and he was never once reprimanded for taking

time off for the Sabbath or other religious holidays.  Cf. Banez v. New York Foundling

Hosp., No. 98 Civ. 518 (GEL), 2001 WL 1035142, at *10 (S.D.N.Y. Sep. 7, 2001) ("A

charge of religious discrimination based solely on two ambiguous comments by a

supervisor cannot survive summary judgment, where, as here, all other affirmative evidence clearly refutes an inference of religious discrimination") (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-110 (2d Cir. 1994)).

c.    Treloar's Second Remark

The final comment about which Yoselovsky complains occurred in April 2009, after Treloar had apparently assigned him what he describes as a "large" project which was due during Passover. (Yoselovsky Aff. ¶ 31). When Yoselovsky reminded Treloar that "the Passover holidays were approaching," she allegedly stated: "I don't want to hear it." (Id. ¶ 33). This comment, on its face, is fairly innocuous; even more so when it is considered in the context of Yoselovsky's history of making excuses for his repeated failure to meet deadlines. (See Ex. D (email from Treloar to Yoselovsky, dated Feb. 3, 2009, explaining the AP's concern that he had not been "putting in the required amount of time to complete [his] work," that "[r]eport due dates have been missed," that "[r]equests for information go unanswered," and that he spent too much effort "providing excuses instead of addressing the issues and problem solving a resolution")).[11] In addition to not being overtly discriminatory, Treloar's comment simply expressed her frustration with what she perceived as Yoselovsky's obstructionist attitude and her exasperation with his

---

[11]    Responding to Treloar's alleged comment about his failure to return emails or respond to requests for information, Yoselovsky alleged at his deposition that he had explained to Treloar that his computer's email system was not working properly and that he would often lose mail or not receive it altogether. (Ex. N at 126). Even if that is true, it is consistent with Treloar's statements in her email that she had the impression that he was routinely making excuses for his workplace inadequacies.

frequent excuses for his inability to complete work on time, rather than a criticism of his religious practices.  See Rajaravivarma v. Board of Trustees for Conn. State Univ. System, 862 F. Supp. 2d 127, 151 (D. Conn. 2012) (lab director's comment that, "I don't care what your religious beliefs are, I don't care about them.  I care about the lab. . . . The lab was messy.  I don't care what you were doing, you son-of-a-bitch," made after employee attempted to explain that he did not have time to clean the lab because he had been on a trip to India for a Hindu ceremony, found to be a non-discriminatory expression of frustration and anger over the employee's irresponsibility toward the lab); McDermott v. N.Y.C. Housing Development Corp., No. 10 Civ. 2029 (HB), 2011 WL 167836, at *5 (S.D.N.Y. Jan. 18, 2011) (comments reflecting a "general level of impatience, irritation and frustration," without any overtly discriminatory reference, are insufficient to raise an inference of discrimination).

In any event, it is undisputed that Yoselovsky had ample time prior to Passover to complete the project, and that he was able to do so without working during the holiday.  Yoselovsky testified that Treloar gave him the assignment on the Thursday before Passover.  (Ex. N at 33).  The Court can take judicial notice that the Passover holiday began at Sundown on Wednesday, April 8, 2009.  See Fed. R. Evid. 201(b); see also Hebcal Jewish Calendar, www.hebcal.com (last visited Jan. 4, 2013) (identifying April 8, 2009, as "Erev Pesach").[12]  Yoselovsky, therefore had at least four non-Sabbath

---

[12]    The AP mistakenly states in its reply brief that Passover in 2009 "did not start until Tuesday," i.e. April 7, of the following week.  (See Def.'s Reply Memo. ("Def.'s Reply") at 4).

days in which to complete the task.  Indeed, he testified that he was able to finish the

project without any problem by "working over the weekend" and without having to work

on Saturday.  (Ex. N at 33).

       At his deposition, Yoselovsky contended that his pre-Passover assignment

was discriminatory because he was "not able [to] . . . produce at [his] best performance

because of the time constraint that [Treloar] gave [him]."  (Id.).  Although this apparently

led him to "believe she was setting [him] up to produce a less than effective product,"

(id.), "feelings and perceptions of being discriminated against are not evidence of

discrimination."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999) (internal

quotation marks and brackets omitted).  Yoselovsky concedes that Treloar had no reason

to believe that he would not be able to complete the assigned project in the time she had

allotted, and he points to no evidence that demonstrates she was otherwise setting him up

to fail.  (Def.'s Stmt. ¶ 89; Pl.'s Opp. Stmt. ¶ 1).  The conclusory allegation that he

"believe[d]" Treloar was somehow attempting to sabotage his work product by giving

him an inadequate amount of time to complete the assignment is, thus, insufficient to

defeat a motion for summary judgment.  See Cameron v. Cmty. Aid for Retarded

Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) ("Purely conclusory allegations of

discrimination, absent any concrete particulars, are insufficient" to withstand summary

judgment).

* * *

Many years ago, Justice Holmes observed that "the character of every act depends upon the circumstances in which it is done."  Schenck v. United States, 249 U.S. 47, 52 (1919).  That wise injunction applies as equally in Title VII cases as it does elsewhere.  See Witkowich v. Gonzales, 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008) (noting that the probative value of an allegedly discriminatory remark may be determined by considering "(1) who made the remark . . .; (2) when the remark was made in relation to the employment decision at issue . . .; (3) the content of the remark . . .; and (4) the context in which the remark was made" (emphasis added)).  Yoselovsky's presentation, however, disregards the important and informing context in which the comments that he alleges were discriminatory arose.  Even a brief review of the circumstances surrounding his employment and his interactions with management at the AP belies any claim of religious discrimination.  Accordingly, the three remarks alleged here cannot serve as support for Yoselovsky's claim that the AP's stated reason for firing him was pretextual.

2.      Temporal Proximity

Yoselovsky further contends that he first began receiving negative performance reviews after October 2008, the month in which he took four days off for religious holidays.  From this, Yoselovsky surmises that, "[a]fter the October holidays, the AP supervisors began creating a record aimed at rationalizing [his] termination." (Pl.'s Opp. Mem. at 18).  In furtherance of this supposed scheme, Treloar allegedly took away two of his staff members, gave him "numerous assignments over an unreasonably

35

short period of time," and no longer allowed him to delegate work to his consultant.  (Id.
at 4).

Although it is true that two AP employees ceased reporting to Yoselovsky
at some point during 2008, both had been hired for fixed assignments that had expired.
Thus, there is no evidence that Treloar, or anyone else at the AP, took away Yoselovsky's
employees as part of a plan to make things more difficult for him.  In fact, in December
2008, Treloar actually increased, from three to four, the number of CIT members assigned
to Yoselovsky.  (Def.'s Stmt. ¶ 93; Pl.'s Opp. Stmt. ¶ 1).  That staffing increase, which
Yoselovsky does not deny, refutes his claim that Treloar was attempting to set him up for
termination by reducing the number of people that reported to him and inundating him
with work that he would be unable to complete.

Nor is there an evidentiary basis for Yoselovsky's claim that Treloar
attempted to set him up for failure by piling on assignments over an "unreasonably short
period of time."  Except for one "large" assignment shortly before Passover, Yoselovsky
presents no evidence that his workload ever increased, or that Treloar knowingly
burdened him with unreasonable projects.  As noted above, there is no indication that
Treloar knew that the Passover assignment would be impossible to complete within the
time period she allotted prior to the holiday, nor is there any reason to believe that this
was her goal since Yoselovsky was able to complete the project over the weekend,
without having to work on Saturday.

Yoselovsky also contends that pretext is established here because of the temporal proximity between his absences for religious holidays and the time when he began receiving negative performance reviews.  He further contends that the AP's decision to terminate him only two weeks after he observed the Passover holidays is evidence of its discriminatory animus.  (Pl.'s Opp. Mem. at 17).  While timing alone may be a basis for establishing a prima facie case, it is not enough to establish pretext at the third stage of the McDonnell Douglas analysis.  See Reilly v. Metro-North Commuter R. Co., No. 93 Civ. 7317 (PKL), 1996 WL 665620, at *14 (S.D.N.Y. Nov. 15, 1996); Peters v. Mount Sinai Hosp., No. 08 Civ. 7250 (CM), 2010 WL 1372686, at *11 (S.D.N.Y. Mar. 30, 2010) (collecting cases); see also Wolf v. Time Warner, Inc., No. 09 Civ. 6549 (RJS), 2012 WL 4336232, at *14 (S.D.N.Y. Sep. 17, 2012) (plaintiff's "wholesale reliance on the timing of her termination" was insufficient to support summary judgment); Gumbiner v. Williams-Sonoma, Inc., No. 05 Civ. 2569 (RMB) (FM), 2006 WL 870445, at *9 (S.D.N.Y. Mar. 30, 2006) (plaintiff's argument that the "temporal proximity" of her complaint to a supervisor to the date of her termination was, by itself, unpersuasive and "not a basis for denying summary judgment").

Yoselovsky sees a similarity between his circumstances and those in Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 92 (2d Cir. 1996), where the Second Circuit deemed it "plausible" that the plaintiff's employer might have issued negative performance reports as part of a plan to create a false record "aimed at rationalizing the plaintiff's termination."  In Chertkova, however, the plaintiff presented

37

"concrete" evidence that her managers were attempting to create a false document reflecting a pattern of poor performance.  Id. at 92.  Indeed, one of the plaintiff's immediate supervisors had been asked by higher management to rewrite a performance evaluation because her review of the plaintiff was "too good."  Id. at 85.  There also was other substantial evidence of discrimination that supported the plaintiff's case.  Here, by comparison, there is no such supporting evidence.  Yoselovsky's argument instead rests solely on his theory there may be something suspicious in the timing between when he took off work for religious holidays and when the AP's allegedly discriminatory actions arose.  Without any additional evidence of some invidious desire to falsify his employment reviews, however, the argument is wholly speculative and must therefore be rejected.  See Schupbach v. Shinseki, ___ F. Supp. 2d ___, No. 09 CV 3513 (JFB) (AKT), 2012 WL 3638791, at *13 (E.D.N.Y. Aug. 23, 2012) ("A plaintiff cannot simply substitute utter speculation for the competent proof that would be necessary to permit rational inferences by a jury of discrimination or retaliation").

### 3.    Prior Performance Reviews

Yoselovsky also suggests that a positive performance review he received in 2005 from his previous employer, JPMorgan, is evidence that the AP's later negative reviews were fabricated.  (Pl.'s Opp. Mem. at 5-6, 16, Ex. 4).  Absent a showing that Yoselovsky's prior job duties were essentially the same as his job at the AP, the old review is utterly irrelevant.  In any event, even if his work at JPMorgan could shed some light on his capabilities, the one positive review to which he is able to point is

38

counterbalanced by a tepid performance evaluation in 2004, which expresses many of the same concerns that the AP managers voiced.  That review notes that, although Yoselovsky "demonstrated good skills in coordination of peoples and tasks," and was "proficient at client relationship management," he, nevertheless, failed to meet his two "development goals."  (Ex. M).  The review goes on to state that Yoselovsky could make greater progress toward those goals through "more effort and dedication" to his work. (Id.).  The evaluation concludes that Yoselovsky "needs to improve responsiveness to important communications from managers and client[s].  He needs to pay closer attention to details in his writing and presentation of material.  He also needs to be more proactive in designing technical solutions and be persistent in driving the planning and implementation of those solutions into production."  (Id.).  In short, Yoselovsky's prior performance at JPMorgan simply does not show that the AP's own stated reasons for his dismissal were pretextual.

        In sum, all of the admissible evidence confirms that Yoselovsky's poor job performance was not a fabrication but, rather, a legitimate concern among those who managed him at the AP.  See Garvin v. Potter, 367 F. Supp. 2d 548, 565-566 (S.D.N.Y. 2005) ("Each of the disciplines was for a reason, such as failure to follow instructions, that was unrelated to the failure to work on Saturdays or Jewish holidays. . . . The plaintiff's suspicions of [religious] discrimination in the absence of any supporting evidence cannot defeat a motion for summary judgment").  Numerous emails sent by three separate managers – Pachter, Ahluwalia, and Treloar – over a six-month time span,

all reflect that Yoselovsky had substantial difficulties meeting expectations.  The fact that

all three spent time in their emails detailing specific problems with his work and offered

to help him improve dispels any claim that he was given negative reviews only out of

some preconceived design by the AP to create a false record so that it could eventually

terminate him because of his religion.  (See Exs. K ("You can take a look at [my edits] or

we can do it quickly together"), D ("If you are unclear on any of these issues or tasks,

please let me know . . . . I am here to support you and help you succeed"), I ("Take a look

at my changes and comments in the report . . . . Set up ½ hr with me if you have questions

about the report changes")).  Yoselovsky never followed up on any of his managers'

offers to help work through some of the problems he was having with his reports.

Finally, and perhaps most significant, is the April 15 email from Jeff Shreves to Treloar,

indicating that Yoselovsky did not appear to "know what he was supposed to be doing,"

(Ex. E).  Shreves was not one of Yoselovsky's direct managers, and apparently had no

motive to lie in his email to Treloar.  Thus, that email is further evidence that

demonstrates that Treloar and Ahluwalia were not simply making up complaints about

Yoselovsky's work.  Having failed to identify any evidence tending to show that the AP's

basis for his termination was pretextual, and in the face of substantial evidence to the

contrary, Yoselovsky's discrimination claim therefore must be rejected.

V.     Conclusion

        For the reasons set forth above, the AP's motion for summary judgment

(ECF No. 20) is GRANTED.  Accordingly, the Clerk of the Court is requested to close

this case.

                SO ORDERED.

Dated:          New York, New York
                January 18, 2013

                                          _____
                                               FRANK MAAS
                                          United States Magistrate Judge

Copies to:

All counsel (via ECF)

41